Good morning people of the state of Illinois versus James Snow for the appellant, Ms. Thompson, for the appellee, Ms. Brooks. You may proceed. Thank you and may it please the court. My name is Tara Thompson and I am counsel for petitioner Jamie Snow. This appeal offers this court with an opportunity to reaffirm and clarify the standard in this appellate district for granting leave to file a successive post-conviction petition as set forth in subsection 1F of the Illinois Post-Conviction Hearing Act. Here, the lower court denied Mr. Snow leave to file a successive post-conviction petition even though he did establish cause and prejudice for the post-conviction claims that he sought to seek as set forth in his petition. And that lower court opinion erroneously stated that he could not file such a petition because he had failed to set forth a colorable claim of actual innocence. Obviously this court is considering the merits of this appeal de novo, but this lower court opinion indicates that it's important for this court to clarify for courts in this district how to apply subsection 1F, how to apply Supreme Court precedent on this standard in order to define what that standard is for the lower courts. Mr. Snow has presented in his post-conviction petition new evidence that he's uncovered that gives rise to claims under both Brady v. Maryland and in the alternative under Strickland v. Washington. And he's demonstrated cause and prejudice. He showed that this is evidence that he could not have discovered before and that in fact he only learned through a recent FOIA request that was made by someone on his behalf. And he's also demonstrated prejudice. He's demonstrated that there's errors in the proceedings that so infected that trial that the trial violated his right to due process. Now, respondent in their response brief referenced People v. Smith, which is an Illinois Supreme Court case that actually came out the day after our opening brief was due. And that case directly addressed this issue of the cause and prejudice standard and how that standard has been applied differently by different districts in Illinois. And paragraph 35 of People v. Smith gives clear direction about how to apply the cause and prejudice standard. And what that paragraph says is that there's really two things for a court to consider when addressing the cause and prejudice standard and the pleadings from petitioners. One is that clearly a petitioner has the burden. They have the burden to demonstrate cause and prejudice in their pleadings and they have the burden to demonstrate why they ought to be given leave. And that's clear for petitioners in all areas of the law and is obviously clear in the post-conviction context as well. But the other thing that's clear, and again what paragraph 35 specifically says, is that leave should be denied when it's either clear that those claims fail as a matter of law or when the petition is insufficient to justify further proceedings. And a read of that paragraph is that that's a reference to failing to demonstrate facts that would allow you to survive cause and prejudice. This is the standard that Mr. Snow met. Now the state's brief essentially concedes the cause issue. It doesn't address cause. It doesn't dispute the facts that Mr. Snow set forth about the FOIA requests and about the other evidence that he got in the form of affidavits from Danielle Prosperini and the fact that he couldn't have obtained that before. So I don't intend to focus on the cause issue unless the court has questions about that piece of it. Clearly the prejudice piece of it is the more important point here. The state looks at the evidence that Mr. Snow presented, both as to the polygraph report that indicates that the eyewitness who said that he saw Mr. Snow at that gas station, the gas station he was accused of committing an armed robbery and a murder at, that is that eyewitness was putting air in his tires. He saw Mr. Snow come out of the gas station. And there's a polygraph report where a description is given of a person who saw the same things that that eyewitness who testified at trial saw. And there's a notation that indicates, and a fair reading of that notation is that this witness says that Jamie Snow was not the person he saw. Now the state looks at that notation and in their response, their argument for why there's no prejudice is that there's many different ways to read this, that it's unclear where this polygraph report came from or what it means. And their argument is that Mr. Snow should not even get the opportunity to pursue this issue because in their view it's unclear. Or in their view there's another explanation for what that notation means and how it ought to be interpreted in this case. But the fair reading is the reading that Mr. Snow gave it and the arguments that Mr. Snow laid out in his post-conviction petition. This is impeaching of that eyewitness's testimony at trial. And it's important that there's an eyewitness who testified, who claimed that he saw Jamie Snow come out of that gas station who apparently in an interview with a polygraph expert said the opposite. And this is different and this is one thing that the state brings up and tries to argue that this is a reference potentially to the lineup or a reference to the fact that when this eyewitness viewed a lineup with Mr. Snow in it, very soon after this crime was committed that that person didn't make an identification. But not making an identification in a lineup is very different from saying this is not the person that this witness says that he saw. That's much more significant and serious than what the prior evidence was available to Mr. Snow about this person indicated. And this is an important issue that needs to be addressed in post-conviction review, which is why Mr. Snow sought leave to file this petition and why he sought leave to pursue this issue. If the state is right, as an aside as well, if the state is right that it's not clear who the witness is being talked about in this polygraph report, if it's not in reference to the eyewitness who testified at Mr. Snow's trial, then that's actually more important because this would indicate that there's actually a second witness who also saw someone come out of that gas station who also says that person is not Jamie Snow and that's even more significant. So either way you interpret that, whether this witness is in reference to the person who testified at trial or someone else, there are significant issues here that Mr. Snow has showed he should have the right to pursue in post-conviction relief. Separate and apart from the notes by the polygrapher, at trial and in assorted proceedings after trial, was Martina's identification of Mr. Snow attacked and impeached by, you know, hey, you knew this guy and yet you couldn't identify him at first? That kind of cross-examination took place, I take it. Well, the cross-examination that did take place certainly referenced the fact that there had been a lineup, that this person was not able to identify Mr. Snow in the lineup and that his identification, the identification about which he testified came years later. That's certainly true, Your Honor. Well, is there anything about him knowing the defendant? No, and that's one of the issues that Mr. Snow raised in his previous post-conviction petition. He presented these affidavits from people who said, hey, Mr. Martinez knew Jamie Snow. That's not something that came up at trial, Your Honor. Okay. And again, this is different than someone saying, well, I saw a lineup and I couldn't identify them. If this notation indicates that there was something much stronger about Mr. Martinez's rejection of Jamie Snow as the person, and that's qualitatively different, and certainly given everything we know about counsel strategy, this is something that counsel would have used because it was the strategy to argue, obviously, that if someone was saying they saw Jamie Snow in that parking lot, that person was not, they're not telling the truth or was mistaken or there was something about that testimony that should be disbelieved by the jury. And the same is true with the evidence that came out and that Mr. Snow presented in his successive, in his motion for leave to file a successive post-conviction petition as to Bruce Rowland. And I don't intend to call these witnesses out by name, Your Honors, but obviously there's many witnesses in this case. It's complicated not to refer to them by name. So I'll talk about Mr. Rowland specifically. There's two pieces of evidence in the successive post-conviction petition that Mr. Snow seeks leave to file that concern this witness. And this is the witness who gave dramatic testimony at trial that he saw Jamie Snow, someone that he knew, at Logan Correctional Center while they were both there, and Mr. Snow, according to Mr. Rowland's testimony, says that Jamie Snow confessed to him about having been involved in this gas station robbery and murder. One piece of evidence that's new that concerns Mr. Rowland is this affidavit from Mr. Rowland's then-wife, now ex-wife, this woman Danielle Prosperini. And she provides detailed information in that affidavit about Mr. Rowland admitting that his testimony was false, about the circumstances that led to Mr. Rowland cooperating with the police, and provides additional information about pressure that was put on Mr. Rowland both directly and through his then-wife for him to participate, and specifically gives an accounting of events that makes clear that Mr. Rowland was cooperating because he specifically needed help on the DUI that he was then facing. He testified at trial that he was testifying to be a good citizen. And it's certainly true that his counsel addressed the issue of Mr. Rowland's DUI and tried to make the inference to the jury that clearly this is a person who was cooperating for his own reasons. But making that inference, presenting that to someone and having them deny it, is very different than having a witness testify, no, this person is here because they want a deal for their DUI, because both of us have been pressured, because I, as his wife, have been told that my kids may be taken away, because this is someone who was seeking a deal and seeking to cooperate with the original detectives on the case many years before. All of that is qualitatively different than what trial counsel had at the time of trial to impeach this important witness. There's also this polygraph report for Bruce Rowland. And the piece of the polygraph report that Mr. Snow didn't have before, and it's different, is that there's an indication by the polygrapher that there were erratic and inconsistent answers to what, to the answer, there were erratic and inconsistent answers from Mr. Rowland as to what Jamie Snow told him. Now obviously, we all know that polygraph results are not typically admissible in Illinois. And so it's not our argument that counsel could have actually used that in some way directly at trial. But what all of the law on Brady says is that information can be exculpatory even if it itself is not admissible, but if it leads to admissible evidence. And if counsel had known that there were issues with Mr. Rowland's honesty that were documented, that he had been confronted with this evidence and given inconsistent answers or erratic answers, this is something that counsel could have used. Maybe counsel would have thought at that point that he needed to speak to Mr. Rowland's ex-wife. Maybe he would have spoken to people close to Mr. Rowland. Maybe if he'd spoken to Mr. Rowland about this issue in his own investigation before trial and had an opportunity to ask Mr. Rowland about that, this would have developed exculpatory evidence. So once again, those are... Do we have any material from Rowland himself or is it only from his ex-wife who claims these things? We don't have anything directly from Mr. Rowland on this issue. So if this were to go back for hearing, we have the ex-wife who says, Rowland said these things to me and what does that mean? Well, what's certainly true is that this at this point is impeachment. What we have in this record that's before this court is not Mr. Rowland acknowledging I lied. At least not him coming before the court to say that, but it's impeachment. And so clearly, a jury would have to weigh the value of her impeachment of him. Because clearly, for starters, Your Honor, he would be confronted with this evidence. And it would certainly be our intention at a post-conviction evidentiary hearing to call him and perform that impeachment and ask him, well, is this true that this happened? Is it true that you told your ex-wife that you had lied? He would be confronted with that impeachment and perhaps he would acknowledge it. Perhaps we would have to perfect the impeachment by calling his ex-wife. It's unclear at this point how that would play out at a hearing. Is that less direct than Mr. Rowland himself admitting that he lied? Possibly, Your Honor. I concede that. But that doesn't make it not relevant. That doesn't make it not exculpatory. And that doesn't make it in connection with the rest of the evidence that there is in this case. Something that could change the outcome. What accounts for the delay in Prosperini's affidavit? I believe. This was a conviction, what, 14 years ago? That's true, Your Honor. Where has she been? She hasn't been in contact with post-conviction counsel. And now she is, and now we should stop everything and go back because she says, I'm the ex-wife and this guy lied. We don't have anything from him at all. We just have what she says. Where has she been? What accounts for this delay? At this point, it's certainly true that she didn't come forward before, and obviously the court's point is well taken. Two responses that I have to that, Your Honor. One is that this certainly is not the only piece of evidence that we're seeking to present to the court, and it's part of the totality of Brady evidence and other evidence that we believe would change the outcome. But number two, there's good law in Illinois that recantations are considered to be new for purposes of the Post-Conviction Hearing Act up until the point that those are taken, unless there's some indication on the record that someone has been saying this all along. Certainly if Ms. Prosperini had been contacting people from the beginning and saying, I know that my ex-husband is a liar. Come talk to me about it. If that were the indication on the record, then maybe Mr. Snow would have some explaining to do about why he hadn't brought that out before. And this would be a different issue. But that's not the indication here. The indication here is that Ms. Prosperini contacted counsel. When counsel learned of this, when Mr. Snow learned that Ms. Prosperini had evidence, they brought it to the court. And the other thing that's also true, Your Honor, is that when you look at the record of Mr. Roland from trial, there is no indication from his testimony or from the reports that counsel has that his then-wife had some role in what was going on in terms of him getting deals, in terms of him seeking assistance from the state or being involved in this process. It may be also different if there was an indication that Ms. Prosperini had been involved, that she had somehow known about what was going on. Then maybe there would be some argument that she, the counsel, either trial counsel or later counsel, had some duty to investigate that issue. But that's not the state of the record before us. We have a person who's come forward. Possibly the amount of time that it took for her to connect up with counsel is something that should be weighed in in terms of assessing her credibility. But you have a record before you. On the face of this record, there's no indication of any kind about that. And that's part of the point of the arguments that Mr. Snow is making generally, is that in this case, this is not a situation where the court allowed Mr. Snow to file this petition, allowed him to make a showing that he would be entitled to discovery to further prove up these claims. And we understand he would have to make a good cause showing for that. But seek that discovery, perfect the record in front of that court, and argue that he ought to get an evidentiary hearing. And it's not a situation where he did get an evidentiary hearing, where a court heard from Ms. Prosperini, heard the impeachment of Mr. Rowland, heard the full story of these notes that have to do with Danny Martinez, or heard about the issues that have to do with Steve Scheel, which is the other piece of this. A court didn't hear any of this. A court looked at this pleading and said, don't come in the door. This is a different situation, where we're saying that on the basis of this evidence, a court concluded he wasn't even entitled to pursue it. The DUI matter was pursued at trial, and Rowland was cross-examined about it, was he not? He was cross-examined about the fact that he had a DUI pending, and he was asked the question, and I'm paraphrasing the counsel's question on this issue, Your Honor, but he was essentially asked if he had been promised something. And what he said was, I'm trying to be a good citizen. And he never acknowledged that he had been promised something, or that this was even on the table for him. What does the record show happened to the DUI? What the record shows happened to the DUI, Your Honor, is that Mr. Rowland did eventually get some assistance in resolving that, and that it was resolved in a matter that would be different than a person with that number of DUIs, than the sentence that a person with that number of DUIs would normally receive. And this was an issue that was actually the subject of one of the motions to supplement that we filed for Mr. Snow before we realized that this petition had already been denied. And so there is further evidence out there about that, but it is not before the court in this record. I don't understand what the claim is from Prosperini's affidavit about taking the kids away. How does that work? What was that claim about? What Ms. Prosperini says in her affidavit is that it was clear at the time of trial, I mean it was public record that Mr. Rowland had this DUI, so that was obvious and clear. What wasn't known was that there were other types of pressure that were being put on Mr. Rowland and Ms. Prosperini in order for Mr. Rowland to assist. And what Ms. Prosperini says is that not only were authorities speaking with Mr. Rowland about this matter, but they were also speaking with her. And that in particular, Detective Katz was telling her that Mr. Rowland needed to participate, and if he did not, there could be consequences specifically for Ms. Prosperini in terms of her children being taken away. What her affidavit also says on this topic is that... Does it say anything about why or how? What it indicates is that that detective told her that his, and I apologize for not having these details clear in my mind, but either that his wife or his ex-wife worked for DCFS and that he had a connection with DCFS. And so for that reason, that wasn't simply a... I'm the authorities, we could have your children taken away, but I have contacts in DCFS and I could do something about that through my contacts. What Ms. Prosperini's affidavit also says is that she herself then also became part of this investigation. She also was involved in covert wiretaps with another witness, Karen Strong, in an effort to get information from that person. And that's also part of the claims that we're making in terms of there being a pattern of misconduct by these detectives to coerce people. And we also believe that there may be information from those wiretaps that would also be exculpatory, although we don't have copies of these tapes. So with all this information, the one thing lacking is, why are you now before us, Ms. Prosperini? That wasn't addressed at all. She doesn't say how it is she's coming forth now? Well, the record is... Shouldn't that be a matter of some interest or curiosity for the trial court and for us? I agree that it's a matter of interest and curiosity. The question is whether... Why wasn't it addressed? I mean, I'm not so naive as to think she's sitting around preparing affidavits herself, counsel. Of course not, Your Honor. Okay, so someone did it on her behalf in consultation with her. Why wasn't this addressed? In terms of why she didn't come forth earlier. The whole thing, yeah. Why are you here now and what's going on? Again, Your Honor, post-conviction affidavits are presumed to be new under Illinois law unless there's some reason to think that they're not. And there's no indication here... And Ms. Prosperini's affidavit, I admit, is silent on this, but there's no indication that she had somehow been contacting anybody about this before. From the affidavit, one could conclude that nobody knew that Ms. Prosperini had anything specific to add until she indicated that she did. And obviously this matter has been... Well, in evaluating prejudice, one of the things we have to decide is, especially in a case like this where, as the prosecutor said at trial, this isn't an eyewitness case. This is a case where, essentially, the defendant convicted himself out of his own mouth and his own behavior. What's the prejudice shown here with regard to Ms. Prosperini? And what is this testimony going to add to the whole big picture, given the policy of finality which the Post-Conviction Act is supposed to have? Go ahead. Thank you, Your Honor. Two potential things on that, Your Honor. I mean, the first is that if someone, if the court wants to make an argument, and I'm talking about the lower court, not this court, but if someone wants to conclude that Ms. Prosperini is less credible because of the time that's passed, then that's an issue that should be addressed in an evidentiary hearing, because Mr. Snow has made the record about what this person has to say. Can't it be considered in the evaluation of whether sufficient prejudice has been shown at all to require that hearing? The court can consider whatever is on the face of what Mr. Snow has presented. And I can see that, obviously, one of the issues on the face of that is that she's coming forward so many years later, and that's true. But that's not enough to say that what she has to say is irrelevant or that it somehow is not worthy of any credit. Is it adequate? I believe it is, Your Honor. And it's adequate because of the specificity of what she has to say about this. So what if this were 2015, or 2025 instead of 2015? Ms. Prosperini now prepares this affidavit. Should we have to stop everything and say, hey, you know, it's been merely 24 years later, but here is Ms. Prosperini's affidavit, and let's conduct a hearing. The prejudice standard addresses that, Your Honor. It addresses – it obviously gives the court – the court has to make some consideration of all of the factors. One factor is clearly the passage of time. That can't be considered alone in the abstract. It also depends on what Ms. Prosperini is saying, and if that evidence is important enough given the context of the case to warrant further investigation. Mr. Snow – Mr. Snow's contention is that in this situation, given the amount of time that's passed in every court case, it does, Your Honor. Thank you. Thank you, counsel. Yes. Yes. Good morning, Your Honors. May it please the court and counsel, I'm Allison Page Brooks, appearing on behalf of the counsel. First of all, this court is faced with a petition. It's at the successive leafed file stage, which requires a showing of both cause and prejudice, and it's made a very high bar for an important reason, which is that there is an important interest in the finality of judgments and that this is not something that is going to be lightly set aside on further review. So in this case, the defendant's showing was not adequate to meet the high standard of prejudice necessary to proceed on a successive post-conviction. Ms. Thompson seems to be suggesting that you aren't challenging the cause since it's based upon FOIA stuff that was obtained recently. Is she correct? Correct, Your Honor, in the sense that when the argument is made that there is a Brady violation as a result of unsupposed evidence that has been obtained since the dismissal of the first post-conviction petition, then the State is unable to allege that there would be no cause for the defendant's failure to present that evidence in the initial post-conviction proceedings because it came afterwards, and that the allegation is that the State... The allegation which has to be taken as true at the stage of proceeding is that the State withheld that evidence, and therefore the defendant does have at least cause part of it, but the defendant has to show both cause and prejudice since the prejudice is lacking. And the standard here is, because these are Brady-type claims, is the same as the Strickland standard, which is whether the defendant has a reasonable probability of a different result had the evidence been disclosed and been able to be used at trial. But what the defense really has here are three different things related to... One related to Danny Martinez, another related to Bruce Rowland, and the third related to Stephen Scheel, each of which is pretty thin in the sense that they... In order to make something out of Danny Martinez, the note in the polygraph that says that... Which is really just very shorthand what is used by the polygraph examiner to explain what the investigation was centered on, information about the investigation, that the defendant's know would be not the person that the witness saw, assuming that that witness being Danny Martinez, the person who was pumping air in his tires at the car station at the time of the robbery. Even if that were the case, that is something that was already capitalized on at the trial, in the sense that the defense cross-examined Martinez and heavily impeached him, most particularly on the fact that during the June 1991 lineup, the crime occurring on Easter Sunday of 1991. So shortly thereafter, the defendant's know was in the same lineup, but Martinez did not identify him. So really what this is saying in this polygraph note, which the polygraph examiner is learning about the state of the investigation at the time of the polygraph in 1994, which is that Martinez did not identify Snow in the lineup. Essentially that's what this is meaning. Now what the defense is trying to say is that this means something entirely different. And that's not supported by what the defendant is offering in this petition, which is this simple, like one shorthand phrase in a polygraph examination report. And what the defendant also wants to do is blow this up into something a lot bigger than simply contesting that there could have been additional impeachment of Danny Martinez. They're also saying that this is somehow part of the pattern of misconduct when the police were out manipulating witnesses to say things that weren't true, which is not supported at all either. And the other reason why they believe that this somehow makes a difference is that they call Danny Martinez the prosecution's star witness, but yet the prosecution, even at the very outset of the trial, emphasized to the jurors that this was not a witness identification case. And the defense had very heavily impeached Martinez during the trial itself, so there really wasn't much of a likelihood that the jury was going to credit his claims, which came in 1999, which is like eight years later, when he supposedly sees the defendant's picture in the paper after his arrest, and then doesn't tell anybody, and then in 2000, looks at a photograph of the same in-person lineup in which he could not identify James Snow, and then makes the identification in the prosecutor's office, and that the defense then very heavily went into the cross-examination about whether the lighting was better in this tiny picture or versus the in-person lineup, and why that, so many years later, that Martinez would be able to make that identification. So really, Martinez's testimony really wasn't worth a whole lot, and it was actually Carlos Luna who did identify the defendant, at least in the element of the 1991 June lineup, that he was able to identify James Snow as the person who looked most like the person that Carlos Luna had seen from across the street. Now, there wasn't, like, he knew that that was James Snow, but even with his post-conviction affidavit, Carlos Luna still thinks that James Snow was the person who looked most like the perpetrator. So the shooting, the killing of William Little occurred in 1991, and there was a 1994 lineup in which Martinez viewed people, including James Snow, is that right? In 2000, I believe, is when he was presented with a photograph of the June 1991 lineup. The lineup would have been several weeks after the shooting. The in-person lineup was photographed, and then after the defendant's arrest, he... I'm sorry, I misspoke. So the lineup was a few weeks after the shooting? Within a couple months or weeks, yes. Okay, and Martinez made no identification of Snow in the lineup? And Snow was in the lineup, yes. So then, almost three years later, when this polygraph exam is taken, the note in the margin says that Martinez says Petitioner is not the person he saw, and your description of that is that refers to the lineup? The state's interpretation of that remark, the word it says, and I think what the defendant is trying to say that there somehow was, they're drawing upon this to blow it up into a situation where, according to their brief, they're having police specifically bringing James Snow's name to Danny Martinez or showing him photos or something, and interviewing him at sometime between 1991 and 1994 when the polygraph of the defendant was held, and feeding him that name and the picture, for example, and hearing a statement back at some other time in some other undisclosed report, for example. They mentioned that there was no police reports dealing with this supposed meeting between police and Danny Martinez. In the state's position that there was no such meeting, it was simply that there was a lineup in which James Snow was there, and Danny Martinez viewed that and did not make an identification of James Snow, which is a shorthand way of saying that Martinez said that the people in the lineup were not the person he saw, including James Snow, who was in the lineup. What about the argument that Martinez was acquainted with Snow as opposed to just an onlooker who might have seen these events? I think it was included in the post-conviction petition, the initial post-conviction petition, one of the Hendricks' affidavits, that there was an allegation that they had some sort of pre-existing relationship growing up or something. That this not necessarily wasn't compelling in the first post-conviction context, and that's not something that... Well, is that now part of this record somehow before us and something we ought to be considering? It seemed to me that was a distinction Ms. Thompson has drawn. I understand it is in the record and can be considered, but it's not enough to show that this shorthand remark in the polygraph examiner's report means anything other than simply that it was a failure to identify the lineup. Well, to be more specific, was this brought out at trial? Any prior acquaintances Martinez may have had with Snow? I don't think so. I'm not sure about that. Because if, as an example, it seems to me it would be, if Martinez knows Snow and sees a killing at a gas station and he is asked about it and there's lots of discussion about it, and he in fact knew Snow before that, it would be, as opposed to just some person he saw commit this crime, that would be a difference if he said, no, I don't know this guy or I didn't recognize him or it wasn't Snow. Would that be significant? It would be more significant if he knew what James Snow looked like around the time of the crime. I don't remember the affidavit saying anything about that there was any sort of present familiarity with the defendant in his current appearance around the time of the crime. If it was something where they either grew up together, for example, versus having some sort of presently existing relationship with James Snow, that would have... Well, what is it in this record as far as the extent to which Martinez was acquainted with a new Snow? I'm sorry, what is the state of the record? Yes, what do we know about this acquaintanceship or relationship or knowledge? I don't know if there's anything other than what's alleged in one of the affidavits provided by somebody I think named Hendricks. There might have been more than one Hendricks. What did it say? I don't remember exactly what it said. Okay, go ahead. Okay, thank you, Your Honors. So with respect to the Bruce Rowland-Daniel Prosperini, again, it's a hearsay affidavit, which doesn't really provide anything substantial with respect to the prejudice issue. Again, the defense tries to blow up this sort of allegation, the hearsay allegation, that Bruce Rowland had received help with the DUI case and received pressure from detectives in order to make a statement and to testify into an allegation that there was patterned misconduct, that police and prosecutors were also giving out deals and making pressure towards other witnesses and then also not disclosing those deals in order to secure statements and testimony. That's what they're trying to do is sort of leverage this sort of remark against one witness who was really just one of many witnesses who, Bruce Rowland, who testified about the defendant's admissions after the crime. So just by itself, Bruce Rowland doesn't really matter a lot in terms of what his testimony was. Even if he, as Daniel Prosperini says, had lied about the supposed admission, there were still several other witnesses who also testified that the defendant admitted the crime to them as well. Same thing with Stephen Shield, just yet another witness who supposedly was going to recant. I think in the first... Prosperini's affidavit, though, is a bit more specific than some that we see.  It tells about his apparent interest in her and showing up at various times and making reference to his spouse's employment at the Department of Children and Family Services and then inducing her to wear a wire to contact another hearsay witness in the case. I mean, it's more than just saying, you know, my husband, Mac's husband's a bum and he lies about stuff all the time and probably lied about this. Even though it's hearsay, it's more than interesting, isn't it? Well, there is a lot of detail in there, and if she is telling the truth about whether she was involved in the investigation, participating in overhears, for example, the recording, we still don't know what would be on those tapes. There's just speculation. I didn't mean so much what would be on the tapes, but more that she had this ongoing, whether you call it relationship or pressure, from a specific detective who's working on the case, and that may be in part where she's getting some of her information about what deal is being offered to her husband or ex-husband. And we add that to the fact that he's a jailhouse informant. I understand. It undercuts Mr. Rowland's testimony. At this stage of the proceeding, they have a high bar to meet in prejudice, and even if they are not recanted, there were a few witnesses like Ronnie Wright and Dan Tannins who did sign recantation affidavits, but still the number of witnesses that include Don Roberts, who partially recanted, but still admitted that the defendant thought that the composite sketch that was made and displayed around time was him. Bill Gattis, who's had the impression that it was someone at the gas station, that the defendant didn't deny that. Randall Howard is the defendant's best friend, who, at least for the minute, that the defendant said that he had committed the crime, until he said that he was actually joking about that. Ed Colombo, the defendant confessed, although he later said he had wanted the deal and had some sort of pressure on him, but he never really recanted the fact that the defendant confessed to him. A cellmate, Bill Moffitt, the defendant confessed to him, although Dennis Hendricks claimed in his affidavit that Moffitt somehow got a time cut. A lot of times these were situations where, like Kevin Shull, for example, who claimed the defendant confessed to him, but then later got a federal sentence reduced because of his cooperation. Situations where there were no deals in place before the testimony, no deals promised, nothing promised, the witness cooperates and then receives some sort of benefit afterwards, does not mean the defendant is correct that there was in fact an unsupposed deal in place prior to the testimony. Who was the witness that testified about seeing little arguing with somebody? Oh, Gerardo Pudieres, I believe. There's no showing that the person who was arguing was actually the perpetrator. He was just a person of interest. He provided some description which wasn't really, it was a separate composite made from his description. I think there was an earring. There wasn't really much of a comparison between the other composite that was in existence versus Pudieres' description. Just continuing with Ed Hammond, the defendant confessed while they were in prison. He had known them for 25 years and there was no recantation of his testimony. I mentioned Shull. Jody Winkler, defendant, confessed to him and apparently he supposedly received a shorter sentence on pending court jury charges after the fact. No deal in place. But the most important thing the statement wants to emphasize here with respect to prejudice is the strong weight of all the police evidence and other circumstantial evidence with respect to consciousness of guilt, for example, and other admissions. Karen Strong testified hours after the crime. The defendant comes by her place and wants to stay for a few days. Then weeks afterwards police find him hiding in Missouri in an attic. And then during the ride back to Illinois he keeps asking police about the Clark Station robbery and shooting. And at the station he's most agitated when they're talking about that crime with him and ends up admitting that he would incriminate himself if he told the truth to the police about his involvement. But isn't, you know, you're right that there's all this evidence against the defendant. But isn't that, to what extent is that something which can appropriately inform the issue before us now? Does that mean that the prejudice, let me restate, if the case were less strong, there was less of this incriminating evidence, would that mean that the claims now being made would have greater weight? Are we supposed to be engaged in this balancing analysis of all this evidence? Would it be reasonable or appropriate for a court in our position to say, this case is so strong that notwithstanding the evidence presented in the prong element here, we're going to reject it and say there's no need to proceed further. Whereas in contrast to another case that was less strong, you've been at this a long time, you can figure out what that would be. Just fewer of these indicia that you've already made reference to. Because of that, we're going to say the case should proceed through subsequent post-conviction analysis and see where we go. Well, this is de novo review, and the state's position is that the trial court appropriately denied leave to file. And the reason why is because the defendant failed to meet the prejudice prong. And the reason why they couldn't meet the prejudice prong is because they're really just chipping away at this case after years and years and years of investigation, but there's still a mountain of evidence that is still compelling that's left. And that's why they can't meet the high standard of showing the evidence. Of course, the issue before us isn't to reverse. The issue before us is whether or not a successive post-conviction petition may be filed and then proceed to the second stage and see what they can say and ultimately maybe have a third stage hearing and actually hear from these people. At which time the trial court, cognizant of the strength of the case, would have to decide whether or not anything has really occurred here that would warrant setting aside the conviction. Right. But the legislature had already imposed the high bar of the cause and prejudice test to even allow leave to file. And that's why, because that disrupts the finality of judgment. And they have to meet that high bar of showing prejudice, and they can't. And some of the other evidence is that the defendant in 1991 in the in-person lineup was refusing to participate. Officers had to physically come over and threaten to hold him in place or cuff him in place in order for him to participate. Very strong consciousness guilt. He also flees in 1999 from Florida, Ohio, gives false name, and flees from police again when he knows he's wanted in connection with murder here. And he also tells Mary Burns in jail that he had been in the alley behind the gas station and knew he committed the murder. This is not a case where the defendant is actually innocent, and so therefore this court should affirm the denial of leave to file. Thank you, Your Honors. Thank you, Counsel. Rebuttal? Two primary points I hope I have time to address. I want to clarify the record on Ms. Prosperini's affidavit and the court's questions about her coming forward. And there is actually another important piece in her affidavit that bears emphasis, which is that she does say in her affidavit that she tried to contact sentencing counsel to tell them that her husband had lied. And she says nothing ever came of that. And it's true in the affidavit that she says, nobody ever contacted me. I didn't reach out until I talked to his lawyers after I contacted his post-conviction counsel when I learned they were looking into the case. That's paragraph 16 and 17 of her affidavit. So she does say, I tried to talk to them initially, nothing came of it, nobody came and talked to me, and then I contacted post-conviction counsel. Fourteen years later because what? Because she learned they were looking at the case. The affidavit doesn't give the level of detail that this court may want it to have or may believe that it needs to have, but it gives enough detail to explain why she's coming forward. It's a detailed affidavit, as the court said, about what she says happened during that time period. She's laying it out there. She's telling the story. For a court to conclude that this is not enough for Mr. Snow even to get to file doesn't meet the requirements of what causing prejudice direct. What about the question I asked Ms. Brooks about the strength of the state's case? Mr. Snow sounds like a real mope who really did a hell of a job incriminating himself by all his behavior. Shouldn't the strength of the state's case serve to inform the extent of prejudice that needs to be shown for a successive post-conviction petition to be filed? I agree with the court that prejudice is not something that is considered in a vacuum and that clearly the court has to assess what is the evidence out there that says that Mr. Snow did this and how do you weigh the new evidence against the evidence that is already there. But respectfully, when the state went through and listed all this evidence, the state started with an acknowledgment that there is significant additional evidence out there from the first post-conviction petition that also suggests that people were given undisclosed deals, that there's recantations from numerous witnesses, maybe not from Bruce Rowland at this time, but from numerous other witnesses saying that they lied or saying that they were given benefits that they didn't talk about. But she also said there were witnesses that hadn't recanted and asserts that there's no showing that any of the accommodations that were made to witnesses were deals, that they occurred after the fact. For certain witnesses, that's true. I mean, this is a case with a ton of people, a ton of witnesses. And so counsel says, well, Mr. Snow's just chipping away, but that's all he can do because of the number of people here. He presented significant evidence the first time around about what was going on and he's added to that evidence here. And we've gone back and forth about the meaning of the Martinez polygraph report, but the interpretation of that that Mr. Snow presents is supported by the record. But the point on all of that is this. You know, counsel says, or maybe counsel tries to suggest, or some case law tries to suggest, or this court might believe that the standard for prejudice is, you know, are you getting over the hump? Is this a 51 percent versus 49 percent situation? But that's not what Brady law really says. Brady law says for prejudice, is the fact that this evidence wasn't presented, or whatever new evidence there is, does that create a verdict that is not worthy of confidence? Does the new evidence that we now know about undermine our confidence in the verdict? These are the state's witnesses. These aren't Mr. Snow's witnesses. You know, counsel wants to say that Mr. Martinez wasn't important, but Mr. Snow didn't call him to testify, the state did. I don't think she's saying that Brady doesn't count. She's saying the mountain of evidence, from her perspective, is such that it doesn't undermine confidence. And clearly that's something that the court has to assess. They have to assess whether this evidence makes a difference. And respectfully, the evidence we presented here, when taken in the aggregate with the evidence from the first time around, which this court should do under Kyle's versus Whitley and other Brady law, there are significant questions about Mr. Snow's guilt. There are significant questions about the case that was presented against him. You mean the evidence the first time around at the post-conviction hearing? I'm sorry to interrupt the court. The evidence that was presented in his first post-conviction petition, the other affidavits that counsel is referencing, it also came post-trial. It wasn't evidence that the jury considered at the time. That was a rejected trial and affirmed by this court, wasn't it? It was rejected in the sense that this court concluded that that evidence standing alone wasn't sufficient for purposes of Brady. So now it's become aggregated? It's no longer just rejected? It's now, in evaluating this, we should go back and evaluate the earlier post-conviction petition and materials? Yes, Your Honor. And the reason why is that for purposes of Brady, the court has to consider what a future retrial would look like. It doesn't say, looking back in the past, let me take this one piece of evidence and see what it says. That's specifically what Kyles v. Whitley says, although obviously that's not in the post-conviction context. The court has to consider what a future trial of this matter would look like.